IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

CMA CGM S.A.,                          :
                                       :
                    Plaintiff,         :
                                       :
v.                                     :              No. 2:14cv504
                                       :
AZAP MOTORS, INC.,                     :
                                       :
                    Defendant.         :


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

This dispute over shipping costs is before the court on the parties' cross-motions for summary judgment. Plaintiff CMA CGM S.A. ("CMA" or "Plaintiff"), citing the terms of its contract with Defendant AZAP Motors, Inc. ("AZAP" or "Defendant"), is seeking to recover the costs CMA incurred when AZAP's cargo was seized by the U.S. Customs and Border Protection Agency ("U.S. Customs"). Pl.'s Mem. Supp. Summ. J., (ECF No. 24, at 22-27). AZAP argues that CMA is not entitled to any additional fees because the company improperly shipped empty containers, did not have "clean hands in the transaction," and the charges sought are unenforceable penalties. Def.'s Memo. Opp'n CMA's Mot. Summ. J. & AZAP's Cross Mot. Summ. J., (ECF No. 27). This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. At

1

CMA's request, the court held a hearing on the cross-motions for summary judgment. At the hearing, the court heard proffers and argument from both parties. Because the facts are mostly undisputed and nearly all of the contested costs are specifically allocated to AZAP in the parties' contract and applicable tariffs, the undersigned recommends that the court GRANT IN PART Plaintiff's Motion for Summary Judgment (ECF No. 23), DENY Defendant's Cross-Motion for Summary Judgment (ECF No. 26), and DIRECT the parties to proceed to trial, if necessary, on damages related to two shipments remaining in dispute.

## I.    STATEMENT OF FACTS

Plaintiff CMA transports ocean cargo for other companies. Compl., (ECF No. 1). Defendant AZAP is a Florida corporation engaged in shipping used automobiles for resale abroad, primarily in the Middle East. Id. AZAP entered into a shipping contract with CMA in June 2013.[1] Id.; see Service Contract Number: 13-1170, (ECF No. 24-1). The year-long contract provided that CMA - designated in the contract as the "Carrier" - would ship containerized cargo for AZAP - designated the

---

[1]    This is a maritime contract case, and the parties, through their contract, agreed to jurisdiction in this court for "dispute[s] arising under or relating to this contract including disputes concerning payment of ocean freight and/or assessorial charges." Service Contract Number: 13-1170, (ECF No. 24-1, at 11). Additionally, their contract provides that the "contract shall be subject to the U.S. Shipping act of 1984, as amended by the Ocean Shipping Reform Act of 1998 (ORSA) and shall otherwise be construed and governed by the laws of the Commonwealth of Virginia. Id.

"Shipper" or "Merchant" – at specific rates, as long as AZAP shipped a specific volume of cargo with CMA.   Service Contract Number:  13-1170,  (ECF  No.  24-1,  at  2).    The  contract  also incorporated the terms and conditions of CMA's applicable public tariffs[2] – specifically tariffs number 020, 100, and 028 – and the  parties'  bill  of  lading.[3]   Under  the  shipping  contract  and incorporated  terms  of  the  relevant  public  tariffs  and  bill  of lading,  the  parties  agreed  to  allocate  responsibility  for  a variety  of  charges  associated  with  ocean  carriage  of  goods.    As relevant  here,  these  included  demurrage,  detention,  customs inspection  fees,  and  other  miscellaneous  charges.    See  Service Contract  Number:  13-1170,  (ECF  No.  24-1,  at  2);  Pl.'s  Memo. Supp.  Summ.  J.,  (ECF  No.  24,  at  3)  (citing  Decl.  of  Stacy Collins, (ECF No. 24-2, at 2)).

In  June  and  July  2013,  AZAP  made  thirty-two  bookings  with CMA under the contract.   Decl. of Stacy Collins, (ECF No. 24-2,

---

[2]      "Each common carrier ... must keep open to public inspection in an automated tariff system, tariffs showing all its rates, charges, classifications,  rules,  and  practices  between  all  points  or  ports  on its  own  route  and  on  any  through  transportation  route  that  has  been established."   80 C.J.S. Shipping § 225 (Westlaw 2015) (citing 46 U.S.C. § 40501(a)(1)).   The tariff then "binds the carrier and the shipper with the force of law and all interested parties are imputed knowledge  of  its  provisions;  the  rate  must  be  charged  and  paid regardless  of  mistake,  inadvertence,  or  contrary  intention  of  the parties."   Id. (footnotes omitted).

[3]      "A bill of lading is 'the basic transportation contract between the shipper-consignor and the carrier; its terms and conditions bind the shipper and all connecting carriers.' "   Norfolk S. Ry. Co. v. Groves, 586 F.3d 1273, 1275 n.1 (11th Cir. 2009) (quoting Southern Pac. Transp. Co. v. Commercial Metals Co., 456 U.S. 336, 342 (1982)).

at 2); see Booking Confirmations, (ECF Nos. 24-2, at 4-60; 24-3, at 1-39). With few exceptions, the particulars of the thirty-two bookings - including the dates AZAP received the containers, the details of their shipment or cancellation, and the dates the empty containers were returned - are not disputed.[4]

Starting in July 2013, U.S. Customs placed a "silent hold" on AZAP's cargo, detaining it at the Port of Savannah, Georgia, as part of an ongoing criminal investigation. See Decl. of Aimee Whittington, (ECF No. 24-10, at 2); see also (ECF Nos. 24, at 1, 7; 27, at 1). The investigation was part of a larger operation performed by U.S. Customs because it "believed that a large number of shippers were mislabeling cargo and illegally shipping automobiles to the Middle East." Decl. of Aimee Whittington, (ECF No. 24-10, at 2). The parties disagree in their characterization of CMA's involvement in the investigation, however, they agree that the investigation was led by U.S. Customs, and shippers, such as AZAP, were not informed that their cargo was seized for a period of approximately three weeks. (ECF Nos. 24, at 1-2; 27, at 1-2).

---

[4]     This report does not detail each booking because both parties largely agree as to the facts of the bookings, but disagree whether AZAP owes CMA additional payment for delays associated with the bookings. See (ECF Nos. 24, at 1; 27, at 1, 3). AZAP argues that the particulars of four bookings are in dispute - arguing that certain containers were not properly shipped or accounted for - and, therefore, it is not liable for costs associated with these bookings. (ECF No. 27, at 13-15). These four bookings are discussed in detail in Part (C)(3).

AZAP argues that "CMA was complicit in deceiving AZAP for the USCBP [U.S. Customs]," (ECF No. 27, at 1, 15-19) (alteration in original), however, when U.S. Customs placed this "silent hold," they informed CMA, but instructed CMA not to tell its customer AZAP that its cargo was seized. (ECF Nos. 24, at 1, 7; 27, at 1, 3); see Decl. of Aimee Whittington, (ECF No. 24-10, at 2). Because of the "silent" nature of the hold, the computer system used by the Port of Savannah and CMA indicated that AZAP's cargo had been loaded onto CMA's vessel; when in reality, U.S. Customs had seized it. Decl. of Aimee Whittington, (ECF No. 24-10, at 2); see (ECF Nos. 24, at 7; 27, at 1-2). As a result of the seizure of AZAP's cargo, each affected shipment was delayed, several were cancelled, and some were redirected to other vessels, all resulting in additional charges. See (ECF Nos. 24, at 7; 27, at 1-2). In addition, because of the "silent hold," AZAP continued to retrieve, load, and deliver new cargo in CMA containers, all of which was also seized. CMA argues that under the terms of the parties' shipping contract, AZAP is liable for the charges that resulted from each shipment's delay. See (ECF No. 24, at 22-27). Its claims involve seven different types of fees allocated to the shipper under the contract documents.

(1) Demurrage[5] and detention[6] charges represent the largest amount of claimed damages. See (ECF No. 24, at 3-6). Specifically, CMA claims that under the terms of the contract and applicable tariff, AZAP owes demurrage charges at a rate of $160.00 per day after the five free days – days during which no charges accrue - permitted for the voyage. Id. at 3; see Tariff CMDU-100, Rule 200, (ECF No. 24-3, at 40-41). With regard to detention, the parties' contract provided that detention charges would accrue at a rate of $90.00 per day for the first five days after the ten-day free time period and $135.00 per day for each subsequent day. See Service Contract, (ECF No. 24-1, at 19) (modifying Tariff CMDU-100, Rule 300, (ECF No. 24-3, at 50)). In total, CMA alleges that AZAP still owes $185,280.00[7] in demurrage charges and $7,785.00 in detention charges. (ECF No. 24, at 4, 8-21). AZAP disputes these facts only with respect to whether CMA is entitled to recover the amounts claimed. (ECF

---

[5] Demurrage is defined as "the charge, related to the use of equipment only, the Merchant pays for Carrier's equipment kept beyond the free time allowed by the Carrier for taking delivery of goods in the port, terminal, or depot." Service Contract Number: 13-1170, (ECF No. 24-1, at 10).

[6] The service contract defines detention as: "the charge the Merchant pays for detaining Carrier's equipment outside the port, termination, or depot, beyond the free time." Id. " 'Free time' is the number of days that a shipper may use CMA's equipment before incurring these charges." Id.

[7] In its brief, CMA asserts that AZAP owes $195,440.00 in demurrage fees. (ECF No. 24, at 4). However, the individual bookings detailed in CMA's brief and supported by the declaration of Stacey Collins reflect demurrage fees of $185,280.00, rather than $195,440.00. See id. at 8-21.

No. 27, at 2-4). In other words, with few exceptions, AZAP does not dispute CMA's calculation of amounts that would be due under the agreed-upon rates, but it denies liability based on legal and equitable positions set forth in its brief.

(2) CMA alleges that AZAP still owes $9,492.00 in customs scan charges. (ECF No. 24, at 4). These charges result from the costs associated with the inspection of cargo by U.S. Customs. Id.; Tariff CMDU-028, Rule 2.33, (ECF No. 24-3, at 44-45). In this case, the rate charged by the Port Authority was $452.00 per container for a partial examination and $904.00 per container for a full examination. (ECF No. 24, at 2); Invoices Attached to Decl. Aimee Whittington, (ECF No. 24-10, at 3-4).

(3) CMA alleges that AZAP owes "cancelled booking fees," which accrue "when a booking is cancelled after the shipper has taken possession of a CMA container." (ECF No. 24, at 4) (citing Tariff CMDU-100, Rule 90, (ECF No. 24-3, at 42-43)). Pursuant to Tariff CMDU-100, Rule 90, cancelled booking fees accrue at a rate of $125.00 per cancelled booking. (ECF No. 24-3, at 42). Due to AZAP's cancellations, CMA alleges that AZAP owes $2,375.00 in cancellation fees. (ECF No. 24, at 5).

(4) CMA asserts that AZAP owes $16,350.00 in roll fees. Id. Roll fees are "charges the shipper (AZAP) must pay when cargo is initially booked to one vessel, but subsequently must be 'rolled,' or booked to another vessel." Id. (citing Tariff

7

CMDU-100, Rule 90, (ECF No. 24-3, at 42-43)). Pursuant to Tariff CMDU-100, Rule 90, roll fees accrue at a rate of $250.00 per container, and the shipper is "subject to any additional charges incurred including but not limited to shifting and re-handling fees." (ECF No. 24-3, at 42).

(5) CMA initially alleged that AZAP owed $14,350.00 in freight charges. (ECF No. 24, at 5). Freight charges are charges that "the shipper (AZAP) must pay to have the cargo transported to its destination, which is fully earned when the booking is made." Id. Under the Bill of Lading, freight is

> deemed fully earned upon booking of the Goods for the carriage and shall be paid and non-returnable in any event. Should the Merchant cancel the booking of the Goods for the carriage, at any time and for any reason whatsoever, he shall be liable for the payment to the Carrier ... of a penalty equal to the value of the Freight, including all charges, costs and expenses deriving from the cancellation of the booking.

Bill of Lading, (ECF No. 24-6, at 8). After briefing, CMA concedes that there was confusion about "whether AZAP wanted some containers to be shipped ... after they were seized." Pl.'s Rebuttal Mem. Supp. Summ. J., (ECF No. 28, at 5). Some of these containers were shipped with very little cargo. As a result CMA has waived $8,400.00 in freight and documentation charges for these mistakenly shipped containers. Id. In total, CMA, therefore, alleges $5,950.00 in freight charges.

(6) CMA asserts that AZAP owes $350.00 in documentation fees. (ECF No. 24, at 5). Pursuant to Tariff CMDU-028, Rule 002.54, "[e]xcept as otherwise noted herein a documentation fee of $50.00 per bill of lading will apply on all U.S. Export shipments." (ECF No. 24-3, at 49).

(7) CMA alleges that AZAP owes $920.00 in release fees and gate fees. (ECF No. 24, at 6). Release fees and gate fees accrue when "cargo that has been already delivered to CMA at the port, [is] returned back to the shipper [AZAP]." Id. (citing Tariff CMDU-100, Rule 002.C (ECF No. 24-3, at 46)).

(8) Finally, CMA alleges that AZAP owes $1,198.00 because it "used credit from another one of CMA's customers, in the amount of $1,198.00, to pay various other unrelated invoices from CMA." (ECF No. 24, at 6) (citing Decl. of Stacey Collins, (ECF No. 24-2, at 2)).

Based on the foregoing summary of charges, CMA's motion asserts that AZAP owes a total of $238,100.00 in fees minus $8,400.00, the freight charges waived by CMA, totaling $229,700.00.[8] Id.; (ECF No. 28, at 5).

---

[8] The calculation is as follows: [185,280.00 (Demurrage Fees) + 7,785.00 (Detention Fees) + 9,492.00 (Customs Scan/Exam Fees) + 2,375.00 (Cancelled Booking Fees) + 16,350.00 (Roll Fees) + 14,350.00 (Freight) + 350.00 (Documentation Fees) + 920.00 (Release Fees & Gate Fees) + 1,198.00 (Mistakenly Applied Credit)] *minus* [8,400.00 (CMA concedes in (ECF No. 28, at 5))] *equals* $229,700.00.

## II.  ANALYSIS

### A.  The Summary Judgment Standard

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986).  "A material fact is one 'that might affect the outcome of the suit under the governing law.'  A disputed fact presents a genuine issue 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.' "  Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183 (4th Cir. 2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis of its motion and identifying materials in the record it believes demonstrates the absence of a genuine dispute of material fact.  Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 322-25.  When the moving party has met its burden to show that the evidence is insufficient to support the nonmoving party's case, the burden shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).  The "mere existence of a scintilla of evidence

10

in support of the [nonmovant's] position will be insufficient." Anderson, 477 U.S. at 252. Rather, when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (internal quotation marks omitted).

In considering a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); see Anderson, 477 U.S. at 255. "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.'" Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) (quoting Philip Morris Inc. v. Harshbarger, 122 F.3d 58, 62 n.4 (1st Cir. 1997)). And in considering each individual motion, the court must again resolve factual disputes and rational inferences drawn therefrom in the light most favorable to the party opposing that motion. Id.

**B.   There Are No Genuine Disputes as to Any Material Facts Regarding AZAP's Liability for Costs Arising from the Seizure of the Cargo by U.S. Customs.**

As set forth above, the parties do not dispute any material facts, and they agree that the shipping contract and incorporated bill of lading and tariffs governed their obligations.   They instead dispute whether AZAP is liable for all of the costs alleged to have accrued under the contract. That is, Plaintiff CMA seeks summary judgment, arguing that the parties' contract specifically contemplated all of the costs it claims resulted from the seizure of AZAP's cargo by U.S. Customs, and, therefore, AZAP is liable for these costs under the contract.   Pl.'s Mem. Supp. Summ. J., (ECF No. 24, at 22-27).   Defendant AZAP also seeks summary judgment, arguing that even though the terms of the contract governed the parties' relationship, and the agreed facts support most of the calculations underlying CMA's charges, legal and equitable defenses prevent CMA from recovering the costs alleged.   (ECF No. 27, at 2, 13-22).   After reviewing the governing contract documents, this report will consider each of AZAP's claimed defenses.

**1.   CMA's Claim for Demurrage and Other Costs Should Be Enforced Pursuant to the Parties' Contract and Applicable Tariffs.**

Historically, courts have enforced shipping tariffs between carriers and merchants who ship their goods with carriers.   See,

e.g., The Albert F. Paul, 1 F.2d 16 (2d Cir. 1924); Gilbert Transp. Co. v. Borden, 170 F. 706 (1st Cir. 1909).   Today, pursuant to 46 U.S.C. § 40501, common carriers, such as CMA, are required to publicly publish their "tariffs showing all ... rates, charges, classifications, rules, and practices between all points or ports on its own route and on any through transportation route that has been established."   46 U.S.C. § 401501(a)(1).   Tariffs bind the shipper and carrier with the force of law.   See Am. Transp. Lines, Inc. v. Wrves, 985 F.2d 1065 (11th Cir. 1993).

In the present case, the applicable tariffs set forth liability for demurrage, detention, and other costs associated with shipping delays.   Demurrage is the single largest amount claimed by CMA.   See (ECF No. 24, 3-6).   In its brief, CMA argues that demurrage charges are "an ordinary provision in a shipping contract, ... [are] considered a 'standard fee' associated with shipping," and are "an accepted form of liquidated damages in shipping."   Id. at 23 (citing Mediterranean Shipping Co. (USA) v. Cargo Agents, Inc., No. 10Civ.5070, 2011 WL 6288422 (S.D.N.Y. Dec. 15, 2011)).   Indeed, AZAP admits that "[t]ypically courts enforce demurrage fees with little question," however in this case, it argues that "equitable and legal principles ... provide AZAP relief from the outrageous charges." (ECF No. 27, at 2, 13-22).

13

Carriers charge demurrage fees because "the productive value of a vessel lies essentially in its use as a carrier, [and] the owner has great interest in the prompt performance of the charterer's duty to load and unload." 22 Williston on Contracts § 58:18 (Westlaw 2015); see Mediterranean Shipping Co., (USA) Inc. v. Int'l Freight Servs., No. 13Civ.1609, 2014 WL 1244274 (S.D.N.Y. Mar. 26, 2014). That is, demurrage is essentially the amount to be paid for any delay not caused by the carrier. See Int'l Freight Servs., No. 13Civ.1609, 2014 WL 1244274; Cargo Agents, Inc., No. 10Civ.5070, 2011 WL 6288422; Earn Line S.S. Co. v. Manati Sugar Co., 269 F. 774, 776 (2d Cir. 1920). Because demurrage and other related costs are typically established in the parties' shipping contract, bill of lading, and applicable tariffs, courts routinely enforce these charges as contract terms agreed upon by the parties. See, e.g., Cargo Agents, Inc., No. 10Civ.5070, 2011 WL 6288422, at *4-5 (discussing the enforcement of shipping contracts and tariffs).

In contract interpretation cases, "[o]nly an unambiguous writing justifies summary judgment without resort to extrinsic evidence, and no writing is unambiguous if 'susceptible to two reasonable interpretations.'" World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992). The first question is, therefore, whether as a matter of law, "the contract is ambiguous or unambiguous on its face." Id. If the

14

contract is unambiguous, the court may "grant summary judgment because no interpretive facts are in genuine issue." Id.

Here, the contract between CMA and AZAP is unambiguous because the parties specifically contemplated the charges that would accrue if the shipment was seized by U.S. Customs and subsequently delayed. Specifically, Tariff CMDU-028, Rule 2.33, which was incorporated in the parties' contract, sets forth the following:

A. CUSTOMS QUARANTINE OR GOVERNMENT REQUIRED CARGO
The Carrier shall not be responsible for delays in transporting or delivering cargo when such delays occur on cargo detained by Customs, quarantine officials or other government required cargo inspection organizations. Any demurrage charges that accrue from such delays either at origin or destination are for the account of the cargo.

B. CUSTOMER OR OTHER GOVERNMENT REQUIRED CARGO INSPECTION
Where Customs, other agencies of a national government, or cargo inspection organizations retained by a national government require that cargo be inspected prior, during or after transportation, but prior to delivery to the consignee, all costs of such inspections will be borne by the cargo ....

F. COSTS OF CARGO INSPECTION
(a) When Cargo in containers is required to undergo inspection by the U.S. Customs Service, Meat Inspection Department, U.S. Department of Agriculture, Environmental Protection Agency or any other U.S. or foreign government agency or private entity acting on behalf of such government agency, Carrier's responsibility will be limited exclusively to making the laden container available to the relevant authorities at Carrier's premises. Any and all costs associated with or arising out of any such inspection including, but not limited to, spotting of the container at the inspection point, storage of the

> <u>container while awaiting inspection or thereafter ...</u>
> <u>shall be for the expense and risk of the Cargo.</u>

Tariff CMDU-028, Rule 2.33, (ECF No. 24-3, at 44-45) (emphasis added).

The language of the tariff is unambiguous, and it is clear from the face of the parties' contract and incorporated tariffs that AZAP is liable for the costs associated with the seizure of its cargo. Specifically, pursuant to Tariff 028, AZAP – as the merchant of the cargo – is responsible for demurrage charges and any other costs that resulted when its cargo was seized. These other charges include documentation fees, cancelled booking fees, and freight charges. Because there is no ambiguity in the terms of the parties' contract, the court should enforce the contract absent some valid affirmative defense.

C.   **The Terms of the Parties' Contract Apply, and AZAP Has No Legal or Equitable Defenses to Liability.**

Although both parties agree that the alleged charges were contemplated by the parties' contract and tariffs, AZAP argues that it is not liable under the parties' contract asserting both equitable and legal defenses. Def.'s Memo. Opp'n CMA's Mot. Summ. J. & AZAP's Cross Mot. Summ. J., (ECF No. 27, at 13-22). First, AZAP asserts that CMA's recovery should be barred or reduced because it had "unclean hands" in connection with the "silent hold." <u>Id.</u> at 15-19. Next, the company argues that the demurrage charges are "unenforceable penalties," because the

16

delays resulting from the seizure caused them to become excessive. Id. at 19-22. For the reasons set forth below, the undersigned recommends that the court reject these equitable and legal defenses and find AZAP liable under the parties' contract. With respect to the facts, AZAP also alleges that one container – NAM1669208 – was returned empty, and therefore, CMA is not entitled to recover the alleged $24,160.00 in demurrage fees for that container. Id. at 22. Next, with regard to four other containers – booking numbers NAM1661368, NAM1667490, NAM1670050, and NAM1656828 – AZAP alleges that CMA shipped them in error or did not give it proper notice that the demurrage charges were accruing. After reviewing each contested shipment, this report concludes that nearly all of the facts are not in dispute and recommends that the court grant CMA's motion for summary judgment in part, deny AZAP's motion and direct the parties to proceed to trial, if necessary, on the remaining damages in dispute.

1.   **The Equitable Defense of Unclean Hands Does Not Apply to CMA's Claim for Contract Damages.**

AZAP first argues that CMA's recovery should be barred or reduced because CMA actively participated in the "silent hold" that led to AZAP sending more containers to the port to be seized. (ECF No. 27, at 15). It also claims that the company's billing practices and recordkeeping problems inflated the

charges. It urges the court to apply the equitable doctrine of "unclean hands" to reduce or eliminate CMA's claims.

The defense of "unclean hands" is an equitable doctrine which "closes the door of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief." Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co., 324 U.S. 806, 814 (1945). No party asserting an equitable claim may be "tainted with inequitableness" in the matter in which the party seeks relief, no matter how improper the behavior of the opposing party. Plant v. Merrifield Town Ctr. Ltd. P'ship, 771 F. Supp. 2d 576, 596 (E.D. Va. 2001) (quoting Precision Instrument Mfg Co., 324 U.S. at 814). But as CMA points out, it is not asserting equitable claims. All of the damages it seeks arise from the contractual relationship between CMA and AZAP, and are specifically allocated in the parties' contract documents. As a result, even if CMA had been "tainted with inequitableness" as a result of its compliance with U.S. Customs' directions, it would not bar assertion of this purely legal claim. Vienna Metro, LLC v. Pulte Home Corp., 786 F. Supp. 2d. 1076, 1084 (E.D. Va. 2011) (rejecting defense of the unclean hands as applied to legal claims); Florists' Mut. Ins. Co., ex. rel. Battlefield Farms, Inc. v. Ludvig Svensson, Inc., No. 3:01cv15, 2003 WL 1856552 (W.D. Va. Apr. 9, 2003) (same).

AZAP argues that because this is a maritime contract and maritime law is replete with references to equity, the equitable doctrine of unclean hands should apply.  It is undoubtedly true, as AZAP argues, that "[e]quity is no stranger in admiralty," Vaughan v. Atkinson, 369 U.S. 527, 528 (1962).  But the availability of equitable remedies does not expand their reach to subsume, or undermine, purely contractual claims.

Moreover, even if the doctrine did apply, the facts relied upon by AZAP are insufficient to establish the claim.  As both parties agree, the equitable doctrine requires inequity, bad faith, unfairness, or fraud respecting the matter in controversy.  (ECF No. 27 at 16) (citing Ample Bright Dev., Ltd. v. Comis Int'l., 913 F. Supp. 2d 925, 940 (C.D. Cal. 2012)).  CMA's conduct in this case meets none of these tests.  At most, the company cooperated with law enforcement by allowing misleading shipping information to be reported to its customers, but there is no evidence to support the inference - urged by AZAP - that CMA exploited the seizure to increase its profits.  AZAP emphasizes the fact that CMA learned of the silent hold on July 23, 2013, and did not reveal the seizure until August 15, 2013.  See Decl. of Aimee Whittington, (ECF No. 24-10, at 1-2); see also August 2013 E-mail Chain, (ECF No. 27-6).  During this time, AZAP sent an additional twelve containers to port, all of which were seized.  (ECF No. 27, at 17).  But other undisputed

facts establish that CMA was specifically instructed not to advise its customers that cargo had been seized. Decl. of Aimee Whittington, (ECF No. 24-10, at 1-2); see E-mail Chain, (ECF No. 27-6, at 4-6); see also Def.'s Memo. Opp'n CMA's Mot. Summ. J. & AZAP's Cross Mot. Summ. J., (ECF No. 27, at 3). In addition, the information it provided to disguise the diverted shipments came directly from the Port Authority of Savannah, which was also specifically instructed not to advise shippers of the U.S. Customs' enforcement action. Decl. of Aimee Whittington, (ECF No. 24-10, at 1-2). It is also undisputed that the shipments initiated by AZAP subsequent to the silent hold were all arranged prior to CMA receiving any notice of the seizure. Thus, CMA did not do anything to increase or aggravate AZAP's exposure to the criminal investigation, other than comply with the specific instructions of law enforcement once it began. Finally, and most importantly, after the seizure was revealed in August 2013, AZAP had direct access to the U.S. Customs' officials involved in the seizure, negotiated extensively with them regarding the seized cargo, and bore responsibility under the parties' contract documents for ensuring that CMA's equipment was promptly returned. The large demurrage charges that AZAP complains of relate to three containers held by U.S. Customs until January of 2014. But it is undisputed that AZAP had access to U.S. Customs from August 15, 2013, and onward, and

thus this extended delay, which accounts for almost a third of CMA's claim, is completely unrelated to the silent hold implemented during the first three weeks of the seizure. Under these circumstances, the defense of unclean hands is both legally and factually inapt.

> 2.   The Demurrage Charges Reflected in the Parties' Contract Are Not Unenforceable Penalties.

AZAP's next argument attacks the contractual demurrage charges as unenforceable penalties. Demurrage is a form of liquidated damages, and thus subject to challenge as an unenforceable penalty. See RG Steel Sparrows Point, LLC v. Kinder Morgan Bulk Terminals, Inc., 609 Fed. Appx. 731, 734-35 & n.5 (4th Cir. 2015); see also Farmers Export Co. v. M/V George Prois, 799 F.2d 159, 162 (5th Cir. 1986).

Evaluating whether any liquidated damage provision is an unenforceable penalty is a two-step process. The first factor the court must consider is whether the amount of the damages matches the anticipated or actual loss caused by the breach.

> The amount fixed is reasonable if it approximates the actual loss that has resulted from a particular breach, even though it may not approximate the loss that might have been anticipated under other possible situations or if the breach approximates the loss anticipated at the time of making the contract, even though it does not approximate the actual loss.

Farmers Export Co., 799 F.2d at 162 (citing Restatement (2nd) of Contracts, Section 356, Comment B (1979) (alteration in original)).

The second factor the court must consider is the difficulty of proving the loss. "The greater the difficulty of proof of loss, the more flexibility is allowed in approximating the anticipated or actual harm." Id. The burden of proving that liquidated damages are an unenforceable penalty is on the party seeking to invalidate the clause on that basis. Int'l Marine, LLC v. Delta Towing, LLC, 704 F.3d 350, 354 (5th Cir. 2013).

In this case, AZAP concedes the second factor - that "it is indeed difficult for CMA to prove the amount of its 'operational loss' as a result of container use per day." (ECF No. 27, at 20). It nonetheless argues that this difficulty does not allow for "any amount of demurrage" and that "at some point," the demurrage becomes an unenforceable penalty. Id. But the demurrage rate is reasonable if it approximates the loss anticipated at the time of making the contract. In this case, it did, as reflected in the published tariffs.

Excessive delay does not convert a reasonable contractual demurrage rate to an unenforceable penalty, even where the period of delay far exceeded the amounts claimed by CMA. See CMA CGM S.A. v. Deckwell Sky (USA) Inc., 91 F. Supp. 3d 841, 850 (E.D. Va. 2015) (awarding $210,909.00 for demurrage on thirteen

22

containers delayed five months); <u>Int'l Freight Servs., Inc.</u>, No. 13Civ.1609, 2014 WL 1244274 (awarding demurrage of $66,192.00 on one container delayed four years); <u>see also</u> <u>Mediterranean Shipping Co. USA, Inc. v. TJD Int'l Inc.</u>, No. 13Civ.6489, 2015 WL 541890 (S.D.N.Y. Feb. 10, 2015) (awarding $58,950.00 for demurrage on two containers delayed two years); <u>Cargo Agents, Inc.</u>, No. 10Civ.5070, 2011 WL 6288422, at *6 (awarding $30,191.00 for demurrage on a single delayed container). Indeed, demurrage has become a standard fee associated with shipping through common carriers such that some courts have found it an implied term in maritime contracts. <u>Int'l Freight Servs., Inc.</u>, No. 13Civ.1609, 2014 WL 1244274.[9]

These cases also rebut AZAP's claim that the demurrage amounts to a penalty "as levied in this action," because the demurrage fees exceed the value of the individual containers. (ECF No. 27, at 19-22). The cost of acquiring a specific container is only one cost associated with maintaining sufficient equipment to ship containerized cargo. In addition to purchasing the container, CMA must store it near the port,

---

[9]   The present case is distinguishable from the cases cited by AZAP for several reasons. <u>See</u> (ECF No. 27, at 19) (citing <u>Int'l Marine, L.L.C. v. Delta Towing, L.L.C.</u>, 704 F.3d 350 (5th Cir. 2013); <u>Mediterranean Shipping Co. S.A. Geneva v. Royale Gulf Shipping Co., Inc.</u>, No. Civ.A.H-99-2486, 2001 WL 34058821 (S.D. Tex. May 30, 2001)). First, in the present case, the contract documents specifically set forth the definition of demurrage and the applicable demurrage rate. Second, the containers accrued demurrage for several months, not several years. And, finally, CMA seeks to recover the fees from AZAP, a direct party to the contract, rather than a third party.

maintain it in good condition, and track and transport it to and
from worldwide locations according to the demands of its
customers. Cf. Itel Containers Int'l Corp. v. Atlanttrafik
Express Serv., Ltd., 668 F. Supp. 225, 229 (S.D.N.Y. 1987)
("[T]o operate at maximum efficiency, there must be a ship's
capacity of containers not only on board a ship, but also at the
ports of embarkation and debarkation to be loaded aboard when
the ship makes its call."). The inability to precisely measure
these other operational costs is precisely why a reasonable
demurrage rate may be defined by contract in advance without
becoming an unenforceable penalty.

   3.  **The Undisputed Facts Establish that CMA Is Entitled to
       Recover Nearly All of the Charges It Billed.**

   As set forth previously, AZAP did not dispute most details
of the shipments, which are established in the summary judgment
record by declarations and attached CMA invoices and other
records. See Decl. of Beth Whetstone, (ECF No. 24-14); see also
Decl. of Stacey Collins, (ECF No. 24-2). In total, the invoices
and spreadsheets documenting the routing of each container
establish fees claimed by CMA on thirty-two separate shipments.
Invoices, (ECF No. 24-4, at 8-68); Spreadsheets, (ECF Nos. 24-
14, at 3; 27-13, at 1). AZAP's response brief and supporting
materials challenge only four of these shipments.

First, AZAP argues that when U.S. Customs returned container INKU2607546 (Booking Number NAM1669208) to CMA, it was empty, and therefore, CMA cannot recover $24,160.00 in demurrage fees for that container. (ECF No. 27, at 13). AZAP claims that under the relevant tariff, demurrage charges stop accruing when "the container is emptied of its contents and/or returned to the custody of the Shipper." Tariff CMDU-100, Rule 200, (ECF No. 24-3, at 40). Additionally, AZAP argues that any interpretation about the meaning of demurrage "must be construed against CMA," and as such, an empty container is not "used" under the definition of demurrage, meaning demurrage fees are not recoverable. (ECF No. 27, at 14) (citing Mitsui & Co., Ltd. v. Am. Export Lines, Inc., 637 F.2d 807, 822-23 (2d Cir. 1981)).

The parties' contract defines demurrage as "the charge, related to the use of the equipment only, the Merchant [AZAP] pays for Carrier's equipment kept beyond the free time allowed by the Carrier." (ECF No. 24-1, at 10) (emphasis added). Both parties agree that the empty container was retrieved by AZAP, loaded with cargo, delivered for shipment, and thereafter seized and held by U.S. Customs. See Decl. of Beth Whetstone, (ECF No. 24-14, at 3, line 10). As such, CMA was not able to "use" the container until it was released by U.S. Customs. The fact that the container was emptied by U.S. Customs at some point during the seizure and returned empty does not change this analysis.

25

Under the terms of the parties' contract, demurrage accrues as a means to compensate the carrier for its inability to use its containers. See Service Contract Number: 13-1170, (ECF No. 24-1). And it was incumbent upon AZAP, as the shipper, to communicate with U.S. Customs and obtain release of the container once its cargo was unloaded. AZAP had access to U.S. Customs to try to secure release of the containers and cargo, and if U.S. Customs would not release the container, AZAP had agreed by contract to bear that risk. Although it is possible, under the facts, that the container was empty at some point prior to its release by U.S. Customs in January, AZAP has presented no evidence to rebut the release date fixed in the U.S. Customs' e-mail.[10] (ECF No. 28-1). AZAP is, therefore, liable for demurrage under the contract for this container that was used beyond the free time period - even though it may have been emptied before its release.

In its next argument, AZAP suggests that CMA increased its damages by mistakenly shipping containers which had been stripped or partially stripped by U.S. Customs prior to their

---

[10] Moreover, it is undisputed that CMA only assessed demurrage fees through January 9, 2014. (ECF No. 27, at 8, para. 27b.). That is, CMA stopped computing demurrage for all outstanding containers - full or empty - in January 2014 when they were released by U.S. Customs. (ECF No. 28-1). Although some containers and cargo were not finally accounted for until later in 2014, CMA did not continue to assess demurrage on these containers. Hawkins E-mail, (ECF No. 27-14) (discussing the use of a container and cargo in May 2014); CMA Shipping-Mackson-Hussein E-mail, (ECF No. 27-16) (discussing the release of a container in October 2014).

release. In fact, CMA conceded that at least one of these containers should not have been shipped. E-mail, (ECF No. 27-15) (requesting NAM1656828 not ship after release from U.S. Customs). There was also documentation suggesting that AZAP did not examine, or intend to ship partially stripped containers after they were released by U.S. Customs. See E-mail, (ECF No. 27-16) (describing partially stripped container shipped to Libya and now stuck in Malta since September 1, 2014); E-mail, (ECF No. 27-19) (discussing container delayed in Libya). As a result of these discrepancies, CMA agreed in its rebuttal brief to waive its claims to freight and documentation charges on four mistakenly shipped containers. (ECF No. 28, at 5) (referencing Booking Numbers NAM1661368, NAM1667490, NAM1656828, and NAM1670050). But the undisputed facts also establish that two of these containers (Booking Numbers NAM1661368 and NAM1667490) were mistakenly shipped after their release by U.S. Customs. See Decl. of Beth Whetstone & Spreadsheet, (ECF No. 24-14, at 3, lines 7-8). It is therefore also undisputed that - as to these two containers - the demurrage and other charges CMA sought in the Complaint all accrued prior to their mistaken shipment. Id.; (ECF No. 24, at 10-11) (confirming demurrage ceased on NAM1661368 and NAM1667490 on September 5, 2013).

AZAP's brief focuses on a few long delays which arose when these stripped or partially stripped containers were mistakenly

shipped and the cargo went unclaimed.  But these delays are not part of CMA's damages on these two containers, nor is there any counterclaim or assertion that the delays imposed offsetting damages on AZAP. In other words, even accepting as undisputed AZAP's claim that these two containers were improperly shipped, that fact is rendered not material by CMA's concession and waiver of its freight and documentation charges.

Although the majority of shipments are carefully accounted for in the summary judgment record, disputes of fact regarding the remaining two containers do create a material issue for trial. These two containers were also released from U.S. Customs on January 14, 2014.  Diaz e-mail, (ECF No. 28-1) (identifying NAM1670050 and NAM1656828).  But unlike the other container returned empty (NAM1669708), CMA's evidence on summary judgment is insufficient to establish that all of the sums claimed on these two shipments are due. One of these containers (NAM1656828) was mistakenly shipped and directed to Malta where it arrived September 1, 2014, nearly nine months after the seizure ended and the container was allegedly released to CMA. Decl. of Beth Whetstone & Spreadsheet, (ECF No. 24-14, at 3, line 12). The charges for this single shipment reflect demurrage of $24,160.00, custom scan fees of $452.00, roll fees of $5,650.00 and a $250.00 gate fee. (ECF No. 24 at 11, para. 22(h)) The other container (NAM1670050) is apparently still

28

unaccounted for, as the notes on CMA's routing spreadsheet do not reflect its recovery or return to inventory. Decl. of Beth Whetstone & Spreadsheet, (ECF No. 24-14 at 3, lines 12-13). The charges for this single shipment reflect demurrage of $24,160.00, roll fees of $6,100.00 and customs scan fees of $452.00. (ECF No. 24 at 11, para. 22(i)).

In response to AZAP's assertion that it should not owe these sums under the terms of the parties' documents, CMA relies on the invoices and routing spreadsheet to contend that all of the charges accrued prior to any mishandling of the two containers and that its agreement to waive freight charges therefore rebuts AZAP's defense. However, unlike the other two mistakenly shipped containers, AZAP's pleadings establish that CMA assessed demurrage through January 9, 2014 (not an earlier shipping date). The company also assessed extensive roll fees during a time when CMA was unable to specifically account for the location of either container. In addition, CMA's claim that the charges accrued prior to the release by U.S. Customs is undercut by CMA's own invoices which reflect roll fees assessed at a rate ($250.00) which did not go into effect until March 2014, two months after the seizure ended, and five months after CMA was specifically instructed not to ship at least one of these containers. (ECF No. 24, at 5) (noting roll fees increased from $200.00 to $250.00 in March 2014); Invoice, (ECF No. 24-1,

29

at 64-67) (reflecting 20 charges for roll fees at $250.00);
Depo. of Aimee Whittington, (ECF No. 27-1, at 21)).

Collectively the charges on these two shipments amount to
$60,974.00. Although AZAP's briefing established that CMA is
not entitled to judgment on these two shipments, it did not
conclusively rebut the claim such that judgment in AZAP's favor
would be appropriate. At trial, CMA may offer evidence regarding
the reasons why roll fees continued to be assessed, and how they
concluded that demurrage and other charges accrued. Omitting
these sums which remain in dispute, the court should nonetheless
find in favor of CMA and impose liability on AZAP under the
contract, enter judgment, award damages as shown by the
undisputed evidence in the amount of $168,726.00 and continue
the case for trial on damages only with regard to these two
shipments.

### III. RECOMMENDATION

For the reasons set forth above, the undersigned recommends
that the court GRANT IN PART Plaintiff's Motion for Summary
Judgment (ECF No. 23), DENY Defendant's Cross-Motion for Summary
Judgment (ECF No. 26), and AWARD Plaintiff damages in the amount
of $168,726.00. If CMA continues to seek damages on the two
disputed shipments, the case should be set for a trial only on
the remaining damages claimed.

## IV. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1.    Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of posting of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure.   A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2.    A district judge shall make a de novo determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

November 25, 2015